# EXHIBIT C

**Figure 2-3. Period Of Performance**

| Description | Period |
|---|---|
| Deployment 1 | 1-Jan-04 to 30-Sep-04 |
| Deployment 2 | 1-Oct-04 to 31-Mar-05 |
| Deployment 3 | 1-Oct-04 to 31-Mar-05 |
| Deployment 4 | 1-Oct-04 to 30-Sep-05 |
| Deployment 5 | 1-Oct-05 to 30-Sep-06 |
| Deployment 6 | 1-Oct-06 to 30-Sep-07 |
| Integrated Logistics Support | 1-Oct-07 to 30-Sep-13 |

## 2.4 Labor

### 2.4.1 BearingPoint, Inc. General Services Administration (GSA) Federal Supply Service (FSS) FSC Group 70 Contract

BearingPoint is proposing its GSA FSS Information Technology Services FSC Group 70 Schedule; contract number GS-35F-4338D (Volume 1, Tab 5), as the basis for our price submission. IAW with FSS provisions we are proposing discounts to our FSC Group 70 Schedule as described in the following paragraphs.

### 2.4.2 Basis for GSA FSS FSC Group 70 Schedule Price Reductions

Recognizing that the best-value task(s) selection under the DOI FBMS BPA will place it above our GSA FSS schedule contract(s) maximum order limitation, and that price reductions to current schedule rates are expected to be reflected in our proposed pricing, we have identified two areas where individual and/or blanket discounts against current rates will be achieved. They are: 1) General volume discounts in consideration of the aggregate duration and scope of the BPA, and 2) the anticipated labor staffing mix of the BearingPoint Team (to include our Subcontractors). Specific rationale providing the basis for our reductions follows.

### 2.4.3 General Volume Discount

In accordance with the intent of I-FSS-646 (Blanket Purchase Agreements) and full recognition that individual DOI FBMS Task Orders may exceed the current Maximum Order Limitation (MOL) against our current GSA FSS Group 70 Schedule contract, and the anticipated duration and scope of the resulting DOI FBMS BPA, BearingPoint proposes a global 10% discount across all proposed labor categories as noted in Column—General Discount, Figure 2-4.

### 2.4.4 Incremental Volume Discounts

Additionally, BearingPoint proposes discounts across all individual labor category rates. The justification for these discounts are the realization of the long-term nature of the individual tasks, and the reliance on a stable, dedicated, and experienced staff necessary to successfully complete each task. Our ability to forecast and commit skilled resources is much easier and more efficient over a longer period of time. As such, we want to ensure that the Government also benefits. BearingPoint has carefully reviewed our proposed Labor Categories against our proposed Master Schedule/POAM. This review has allowed BearingPoint to analyze the projected labor mix over the life of the DOI FBMS BPA resulting in the further discounting of individual labor categories.

This discount is applied to each rate based it's associated value. The level of discount is applied based on the associated dollar range. The resulting incremental volume discount range, taking the above-mentioned factors into account, range up to 33.33% based upon individual labor

# EXHIBIT D

BearingPoint

1676 International Drive
McLean, VA 22102-4828
Tel: +1.703.747.3000
Fax: +1.703.747.8500

www.bearingpoint.com

July 8, 2005

Mr. Peter Hunter
Contracting Officer
Gov. Works
381 Elden Street, MS 2510
Herndon, Virginia 20170

Re: Adequate Assurance of Future Performance

Dear Mr. Hunter:

This is in response to your email of July 7, 2005, in which you seek a "formal acknowledgment that BearingPoint cannot meet its obligations under Order #37408 to deploy three bureaus in October of 2005."

We are puzzled by your request because your email includes two quotations of our written position on this issue. Moreover, DOI and BearingPoint have been engaged in discussions relative to a new go-forward schedule that is predicated on an acknowledgment that the October "go-live" date is unrealistic. With that said, BearingPoint appreciates the opportunity to reiterate its position.

As indicted in our earlier correspondence to you, BearingPoint has worked at risk since April 7, 2005 because BearingPoint has yet to receive a valid contractual document extending the funding of Order # 37408 beyond April 6, 2005. In so performing, BearingPoint specifically advised DOI that BearingPoint's continued performance should not be construed by DOI as acceptance of Modification 6. Thus, since BearingPoint has no current obligation to perform under Order # 37408, there is no contractual obligation "to deploy three bureaus in October of 2005."

In addition and apart from the issue caused by the lack of a valid contractual document, the FBMS program has encountered various delays that warrant schedule and other relief. While some of the delays were caused by DOI and some of the delays were caused by BearingPoint, the net effect is that there has been excusable delay that has rendered an October "go-live" for all three bureaus unrealistic.

We have been and are prepared to continue in good faith negotiations to resolve our outstanding contractual issues. As you know, you previously requested an adequate assurance from BearingPoint on June 8, 2005. As indicated in our June 20th response to that request, there are some fundamental issues that require discussion. We remain prepared to discuss those and all other issues relative to the program.

Should you have any questions, please do not hesitate to contact me by phone at (703) 747-5566 or via email at virginia.baxter@bearingpoint.com.

Sincerely,

Virginia A. Baxter
Senior Contract/Subcontracts Administrator
DOI FBMS Project

cc: Robin Lineberger
Tom DeGarmo
Brad Bends
Susan Weersing
Matt Peebles
Timothy Harris
William Lieth

# EXHIBIT E

DECLARATION OF APRELL JOYCE

I, Aprell Joyce, pursuant to 28 U.S.C. § 1746, declare:

1. I make this declaration based upon my personal knowledge, and if called and sworn as a witness, I could and would testify under oath to the facts as set forth below.

2. I am the Department of the Interior's Contracting Officer for the Financial and Business Management System (FBMS).

3. The FBMS contract was awarded to BearingPoint, Inc. by Blanket Purchase Agreement No. 73873 under the General Services Administration (GSA) MAS Contract No. GS-35F-4338D.

4. Beginning in mid-August, 2005, I began making numerous attempts to contact Ms. Jacqulin Draughn, the General Services Administration's Schedule Contracting Officer for the BearingPoint Schedule contract due to the potential termination for cause of BearingPoint. These attempts included speaking with Ms. Draughn's supervisor, Montrez Nicholson. After speaking with Ms. Nicholson, I was contacted by Ms. Draughn.

5. On September 7, 2005, I spoke with Ms. Draughn to discuss the meaning and effect of Schedule 70 Contract clause I-FSS-249-B (Default), GSA's rationale for including the clause, and the fact that it conflicted with the current Federal Acquisition Regulation (FAR) clauses, FAR 8.406-4 and 8.406-6. In that conversation, Ms. Draughn speculated that the clause had been drafted to "protect the contractor," although she had no further information. She said that it was a "tailored clause" approved by GSA's lawyers and that she would check with them to gain a greater understanding of the intent and purpose of the clause.

6. On September 9, 2005, I followed up by sending an email to Ms. Draughn, stating that:

I was hoping to hear from you or GSA attorney today regarding the clause in Schedule 70 contract I-FSS-249-B (Default).

I understand that you are researching this and attempting to contact the attorney, but in addition to the questions that I have previously asked, I would like to add the following:

Is it possible for you as the Contracting Officer or GSA to delegate the authority of making the determination on whether the failure is excusable? [Can you please get] back to me? I can submit the request via a formal letter if needed.

Thank you and I look forward to talking with you soon.

7. On September 12, 2005, Ms. Draughn responded via email to me, stating as follows:

Generally, when a dispute arises that relates solely to the task order (i.e., does not impact the schedule contract), the contracting officer responsible for issuing a final decision is the task order CO. If, however, there is a dispute that goes to the terms and conditions of the schedule contract, the matter must be referred to the schedule contracting officer for resolution.

Late delivery seems like a performance issue, a matter for resolution at the task order level. Also, note that FAR 8.406-4 governs terminations for cause under the schedules program. Although it requires compliance with FAR 12.403, it is important to start with and follow the 8.4 procedures. Please call me with any questions on (703) 605-2715.

8. Following the September 12, 2005 email, I immediately called Ms. Draughn. I asked whether Ms. Draughn's emailed response had been coordinated with GSA legal counsel. Ms. Draughn replied affirmatively. I further pursued the matter, asking again whether there was any rationale for inclusion of the I-FSS-249-B clause in the Schedule contract. Ms. Draughn indicated that she had no further information than contained in her email. Ms. Draughn also advised, in response to my continued questioning, that in her years as a contracting officer on the BearingPoint Schedule contract, she had not encountered any issues related to the clause. I then

asked if Ms. Draughn knew of anyone else at GSA who had encountered issues related to the clause. Ms. Draughn knew of no one else. I also asked about Ms. Draughn's experience assisting non-GSA contracting officers with performance issues arising under task orders issued against GSA Schedule contracts. Ms. Draughn related no direct experience and knew of only one contracting officer who had such experience.

9. Additionally in the conversation following the September 12, 2005 email, I asked Ms. Draughn whether authority to make all relevant determinations could be delegated to me. Ms. Draughn said she would consider the question.

10. In this and previous conversations, I advised Ms. Draughn of serious BearingPoint performance issues resulting in escalating correspondence including cure notices. Copies of the cure and termination notices sent to BearingPoint, along with selected other BearingPoint correspondence, were provided to Ms. Draughn the same day or within a couple of days of issuance.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 20, 2007.

Aprell Joyce
Aprell Joyce

# EXHIBIT F

**Joyce, Aprell**

**From:** jacqulin.draughn@gsa.gov
**Sent:** Monday, September 12, 2005 10:01 AM
**To:** Joyce, Aprell
**Cc:** Joyce, Aprell; Michael_J_Johnston@fbms.doi.gov
**Subject:** Re: GSA Clause

Joyce,

Generally, when a dispute arises that relates solely to the task order (i.e., does not impact the schedule contract), the contracting officer responsible for issuing a final decision is the task order CO. If, however, there is a dispute that goes to the terms and conditions of the schedule contract, the matter must be referred to the schedule contracting officer for resolution.

Late delivery seems like a performance issue, a matter for resolution at the task order level. Also, note that FAR 8.406-4 governs terminations for cause under the schedules program. Although it requires compliance with FAR 12.403, it is important to start with and follow the 8.4 procedures. Please call me with any questions on (703) 605-2715..

"Joyce, Aprell"
<Aprell.joyce@mms.gov>

09/09/2005 03:38 PM

To
jacqulin.draughn@gsa.gov

cc
Michael_J_Johnston@fbms.doi.gov, "Joyce, Aprell" <Aprell.joyce@mms.gov>

Subject
GSA Clause

Hello Jacqulin,

I was hoping to hear from you or GSA attorney today regarding the clause in Schedule 70 contract ? I-FSS-249-B (Default).

I understand that you are researching this and attempting to contact the attorney, but in addition to the questions that I have previously asked, I would like to add the following:

Is it possible for you as the Contracting Officer or GSA to delegate the authority of making the determination on whether the failure is excusable ?
back to me? I can submit the request via a formal letter if needed.

Thank you and I look forward to talking with you soon.

V/r,

Aprell Joyce
Contracting Officer
Minerals Management Service/GovWorks
381 Elden Street
Herndon, VA 20170-4817
703.787.1161
aprell.joyce@mms.gov

**Joyce, Aprell**

**From:** jacqulin.draughn@gsa.gov
**Sent:** Friday, September 09, 2005 4:00 PM
**To:** Joyce, Aprell
**Subject:** Jacqulin M. Draughn/FCI/CO/GSA/GOV is out of the office.

I will be out of the office starting 09/08/2005 and will not return until 09/12/2005.

I will reply to your message upon my return. You may contact Evangeline O'Neal on (703) 605-2713 for assistance.

# EXHIBIT G

GovWorks
FEDERAL ACQUISITION CENTER
Government working with government.

October 20, 2005

Ms. Virginia Baxter
BearingPoint, Inc.
1676 International Drive
McLean, VA 22102

Subject: Cure Notice Regarding Remaining Deployments under BearingPoint FBMS Proposal—BPA No. 73873

Dear Ms. Baxter:

You are hereby notified that the Government considers deployment of the Financial and Business Management System (FBMS) under BPA No. 73873 to be endangered on the following grounds:[1]

A. <u>Continuing, express unwillingness to be bound to contractual obligations</u>

By letter dated June 20, 2005, BearingPoint took the position, among other things, that it is not obligated to accept individual task orders issued by the Department of the Interior (DOI); it is not obligated to honor any order for a combination of items in excess of the Federal Supply Schedule contract maximum order threshold; and the quantities contained in BearingPoint's proposal are not binding.

On September 2, 2005, we advised BearingPoint that its "fundamental obligation is to perform this contract diligently at the agreed firm-fixed price and within schedule." We noted that the understanding of the parties at the time of award was that this was a firm-fixed price commitment, to be compliant with set schedule milestones, and incorporative of BearingPoint's detailed proposal. We stated our view that, by its June 20 letter, BearingPoint "disavowed" and "renounce[d]" its promised performance and, because of this, we reserved the right to consider BearingPoint to be in anticipatory breach. Yet, in its letter of September 20, 2005, BearingPoint's response was merely to state that, as "set forth in [BearingPoint's] letter of June 20, 2005, BearingPoint has a different view."

You are hereby notified that the Government considers the position stated in Bearing-Point's letter of September 2, 2005, and also communicated in other instances, to be an

[1] We regard each ground to be an independent, legally sufficient basis on which to issue this cure notice.

express and unequivocal manifestation of BearingPoint's intention not to provide its promised performance within the time and at the cost agreed. BearingPoint's response of September 20, 2005, has not provided any assurance to the contrary.

B. <u>Lack of accountability with respect to number of Oracle licenses</u>

In addition to BearingPoint's blanket disavowal of its obligations, there is another noteworthy instance of BearingPoint failing to adhere to its promises. At pages 2-5 through 2-7 (in paragraph 2.6.2 and Figure 2-6) of its proposal, BearingPoint represented that twenty (20) *Oracle 9i* and four (4) *Oracle 9iAS* licenses would be required to "fully satisfy all of DOI's FBMS functional business requirements." Later, BearingPoint announced that up to ***202*** Oracle licenses would be required, increasing the cost to DOI by some $29 million. This unexpected change to the very foundation of BearingPoint's proposed solution—and attendant disruption to DOI's expectations—only further demonstrates a critical and troubling lack of accountability.[2]

C. <u>Failure to make adequate progress</u>

BearingPoint's failure to make adequate progress, among other identified deficiencies, under Task Order 0404D037408 (Task Order 3), and its failure to provide adequate assurances after receiving a cure notice, resulted in DOI terminating that Task Order for cause on September 29, 2005.[3] This is yet another reason for the Government to deem performance under the remainder of the contract (Deployments 3 and 4) endangered.

D. <u>MITRE Analysis: Demonstrated inability to develop and implement a schedule</u>

Finally, in August 2005, DOI contracted with The MITRE Corporation to conduct an independent assessment of BearingPoint's ability to achieve project milestones. In

---

2 Indeed, the contracting officer, by letter of June 8, 2005, identified this seven-fold increase in required Oracle licenses as cause to ask BearingPoint for "Adequate Assurance of Future Performance." On June 20, 2005, BearingPoint responded by expressly disavowing its contractual obligations.

3 In its letter of October 11, 2005, BearingPoint suggests that DOI's termination for cause of Task Order 0404DO37408 (Task Order 3) "render[s] impossible BearingPoint's continued performance of its contractual obligations." It is noteworthy that DOI did not terminate Task Order 3 until September 29, 2005. Prior to this, BearingPoint was given ample opportunity, but repeatedly failed, to give adequate assurances both regarding Task Order 3 *and* the balance of its contractual obligations beyond Task Order 3. Despite repeated opportunities to provide an explanation, BearingPoint never met its burden of proving the requisite connection between specific events and any period of delay to which it seems now to be claiming entitlement. When we requested adequate assurance of BearingPoint's ability to fulfill its obligations, BearingPoint did not provide a plan of action, but merely proferred a general intention to proceed with performance.

addition to conducting numerous interviews with BearingPoint and government personnel, MITRE evaluated BearingPoint's revised 2A Deployment schedule, dated September 6, 2005 (and also a "resource loaded" version dated September 7). MITRE presented its findings both to government and BearingPoint management on September 22, 2005. Among other things, MITRE found that project "activities and dependencies" were missing from the schedule, the schedule did not tie into earlier past-due activities ("dependencies"), it was not compliant with industry standard practices in several respects, and it was not useful as a management tool. In addition, MITRE found that project team members were working in "stove-pipe" environments, preventing the development of an integrated solution, "resource loading" had not been accomplished, and unlimited government resources were assumed. This all led MITRE to conclude that BearingPoint's deployment schedule was incomplete, unreasonable, and unlikely to be achieved.

BearingPoint's demonstrated inability to schedule and execute complex "activities and dependencies" —a critical capability under this requirement—is an additional reason for the Government to deem performance under the remainder of this contract to be endangered.

Accordingly, the Government will terminate the remainder of this contract for cause, and will reserve the right to acquire similar services and items from another contractor and charge BearingPoint with any excess reprocurement costs, unless, within five (5) days of receipt of this notice, BearingPoint cures its failures by setting forth:

- An affirmation of the accuracy of the representations set forth in its original FBMS proposal (*e.g.*, the amount and types of software that must be provided by the Government) and intent to be bound by its representations;

- A plan of action that details how BearingPoint intends to fulfill its obligations under the BPA with respect to the remaining deployments under the BPA; and

- Assurances that BearingPoint will abide by its promises.

This cure notice does not apply to the work that BearingPoint is currently performing under **Delivery Order 0405DO40356,** ***Task Order Hosting Infrastructure Support*****, and Task Order 0405TO41264**, ***Application Management Support***, nor to **Task Order 0404DO37408 (Task Order 3)**, which was previously terminated for cause on September 29, 2005.

Any explanations of why BearingPoint cannot meet any of its obligations or affirm the representations in its original proposal will be considered so long as they set forth details that include a clear demonstration of the causal connection between any event(s) that occurred subsequent to award of the contract and BearingPoint's inability to cure the foregoing deficiencies.

If you have any questions or would like to discuss these issues, please contact me at (703) 787-1161, or by email at aprell.joyce@mms.gov.

Sincerely,

Aprell Joyce
Contracting Officer

Cc: GSA Schedule Contracting Officer

# EXHIBIT H

GSA

FAS Clause Manual@GSAEXTERNAL

02/16/2007 02:23 PM

To

cc

Subject Clause Manual Notice-PIN 2007-02, Removal of I-FSS-249-B, Default, and FAC 2005-15 Addendum, Technical Amendments

To: FAS Clause Manual Users

The FAS Clause Manual has been updated to include:

1. Procurement Information Notice (PIN) 2007-02, Removal of I-FSS-249-B, Default. This clause has been utilized on a "Required as Applicable" basis for GSA Schedule solicitations and contracts. The clause should no longer be used and needs to be removed from all existing solicitations and contracts. Schedule contracting offices should remove I-FSS-249-B from all solicitations at the next refresh, and remove it from all in-house offers prior to award.

Consequently, subject clause has been removed from the FAS Clause Manual.

2. FAC 2005-15 Addendum, Technical Amendments, dated Tuesday, February 13, 2007 makes technical amendments to the Federal Acquisition Regulation (FAR) to update references inadvertently omitted from the original issuance of FAC 2005-15 published in the Federal Register at 71 FR 74656 on December 12, 2006 and effective on February 12, 2007.

---

In accordance with FAR 1.108-" (d) Application of FAR changes to solicitations and contracts. Unless otherwise specified-
(1) FAR changes apply to solicitations issued on or after the effective date of the change;
(2) Contracting Officers may, at their discretion, include the FAR changes in solicitations issued before the effective date, provided award of the resulting contract (s) occurs on or after the effective date of the change; and
(3) Contracting Officers may, at their discretion, include the changes in any existing contract with appropriate consideration."